UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION, CANTON

---------------------------------------------------------x
In re:                                          :     Case No. 21-6
                                                :
HERITAGE CHRISTIAN SCHOOLS                      :     Chapter 11
OF OHIO, INC.                                   :
                                                :     Judge Russ Kendig
  an Ohio corporation,                         :
                                                :
      Debtor and                              :
      Debtor-in-Possession.                   :
                                                :
(Employer Tax I.D. No. 34-1026284)              :
---------------------------------------------------------x

**MEMORANDUM IN SUPPORT OF DEBTOR'S MOTION FOR ORDER
AUTHORIZING INTERIM AND FINAL USE OF CASH COLLATERAL**

**I. INTRODUCTION**

On February 2, 2021, (the "Petition Date"), the Debtor commenced its reorganization case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is continuing in possession of its property and is operating and managing its business, as a debtor in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of the Debtor's chapter 11 case and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409 and Local Bankruptcy Rules.

The Debtor entered into several credit agreements with its primary prepetition lender, Huntington National Bank, successor to Unizan, ("HNB"). The Debtor executed promissory notes, security agreements, and mortgages with HNB on or about July 1, 2002, and September 15, 2014 as those documents may have been modified or amended from time to time, under which the Debtor borrowed approximately $550,000 from HNB. HNB's promissory notes, mortgages, and assignments are attached to the Motion as Exhibits A (the "HNB Notes"), B (the "HNB UCCs"), and C (the "Mortgages").

To secure its prepetition obligations to HNB, the Debtor granted to HNB a security interest in the Debtor's property (the "Collateral") including:

a. accounts receivable, inventory, work in progress, and raw materials;

b. furniture, fixtures, and equipment;

c. the Debtor's remaining tangible and intangible property; and

d. the Debtor's real property located at 2107 6th St., S.W., Canton, Ohio 44706.

HNB held the first priority security interest in the above listed collateral.

On or about November 14, 2019, HNB sold or assigned the HNB Notes and Mortgages to Private Capital Lending. See Exhibits A and C attached to the Motion. Subsequently, Private Capital Lending assigned the HNB Notes and Mortgages to Heritage Canton, LLC in their entirety. The HNB UCCs appear to have been assigned to Quest Solutions, Inc. ("Quest"), see Exhibit B attached to the Motion, but Quest does not appear to have been assigned any of the debt evidenced by the HNB Notes.

Although Quest has a security interest in the Debtor's cash collateral through the HNB UCCS, it was not assigned the HNB Notes and consequently, there is no debt held by Quest secured by the HNB UCCs. Accordingly, Quest has no claim for adequate protection arising

from the Debtor's use of cash collateral, but, out of an abundance of caution, the Debtor filed its Motion for authority to use cash that may be Quest's cash collateral.

**II.     LAW AND ARGUMENT**

1. Introduction

Section 363 of the Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code") and Rule 4001(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizes the Court to enter interim and final orders authorizing the debtor to use cash collateral (as that term is defined in section 363(a) of the Bankruptcy Code).

Assuming without conceding that Quest has an interest in the Debtor's cash, Section 363(c)(2) provides that the Debtor may use the Quest's cash collateral with its agreement or upon proof of adequate protection, as that phrase is defined in section 361 of the Bankruptcy Code, to Quest. Section 363(c)(2) states in pertinent part that:

> The Trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

In this case, the Debtor may use Quest's cash collateral because either: (i) it has no interest deserving of adequate protection because it holds no debt against the Debtor; or (ii) adequate protection is provided to Quest as described below.

2. Adequate Protection

Section 361 of the Bankruptcy Code provides that adequate protection may be provided by a cash payment or periodic cash payments, "an additional or replacement lien", or relief constituting the "indubitable equivalent" of the creditor's interest. The concept and purpose of "adequate protection is to insure that the secured creditor receives the value for which he bargained.'" Martin v. United States of America, et al. (In re Martin), 761 F.2d 472, 474 (8d' Cir 1985) (citations omitted).

One method of providing adequate protection is a replacement lien on what has been described as "soft collateral". See, In re Dynaco Corporation, 162 B.R. 389, 394 (Bankr. D. N.H. 1993). Soft collateral was described by the Dynaco court as raw materials, work-in-process, inventory, and accounts receivable. Id. at fn. 3. In Dynaco the court analyzed a floating or replacement lien on soft collateral over a period long enough to evaluate the question of whether the secured creditor is, or is not, being exposed to a substantial danger of a permanent decline in the level of the soft collateral supporting "its floating lien." Dynaco at 394. Furthermore, when this issue is raised early in a reorganization, the debtor will be permitted to continue in business if the debtor makes a "solid" evidentiary showing to support its projections. Id. In short, to determine the adequacy of an equity cushion, the stability of the collateral, the likelihood of reorganization, and the credibility of the Debtor's proposal for furnishing adequate protection must be examined.

For example, in Mbank Dallas, N.A. v. O'Connor (In re Connor), 809 F.2d 1393 (10th" Cir. 1987), the court authorized the debtor to use $721,000 of cash collateral to drill three new gas wells that were expected to produce revenues with present value of $3,674,000. Finding that the secured creditor was adequately protected by the debtor's excellent prospects of success and

the potential value of the new revenues, despite the inherent risk of drilling dry holes, the court held that "[i]n order to encourage the Debtor's efforts in the formative period prior to the proposal of a reorganization, the court must be flexible in applying the adequate protection standard. " Id. at 1398 (citations omitted). See also, In re 495 Central Park Avenue Corp., 136 B.R. 626 (Bankr. S.D.N.Y. 1992) (projected property improvements constituted adequate protection when rental income from lease conditioned on improvements would increase value of real estate by at least $800,000); In re Sheehan, 38 B.R. 859 (Bankr. D.S.D. 1984) (court allowed cash collateral to be used in exchange for replacement lien on crops to be grown with the cash, relying on evidence that debtor's prospects for a profitable crop were good).  In this case, If Quest is entitled to adequate protection for its interest in the Debtor's cash, the Debtor will provide adequate protection to the Quest through a replacement lien on the Debtor's post-petition tuition receipts.

3. Adequate Protection Provided by the Debtor to Quest

If Quest is entitled to adequate protection, the Debtor will proposed a replacement lien on post-petition tuition receipts.  Permitting the Debtor to utilize cash collateral will have the dual effect of enhancing Quest's protection serving a necessary role in the Debtor's reorganization efforts.  As the Debtor's Interim Budget demonstrates, the Debtor's continued operations will generate new accounts receivables and cash will enhance Quest's position, and moreover, will allow the Debtor to reorganize and restructure its finances.  Cash and accounts receivable will increase at a rate greater than the Debtor's use of cash collateral during the period the Debtor continues to operate its business. Absent use of cash collateral, the Debtor would be forced to cease operations and liquidate its assets thereby reducing the value to be available for the benefit

of the Debtor's creditors. The law fully contemplates this flexible position in evaluating the Debtor's ability to provide adequate protection.

    4.    <u>The Commercial Reasonableness Standard</u>

In terms of valuing Quest's collateral, the Debtor's property may be valued using a "going concern" approach as opposed to a liquidation model. Many courts, in valuing collateral pursuant to section 506(a) of the Bankruptcy Code, have applied the "commercial reasonableness" standard enunciated in <u>In re American Kitchen Foods. Inc.</u>, 2 B.C. D. 715 (Bankr. D. Me. 1976):

> Where collateral is used or produced . . . by a going business which offers reasonable prospects that it can continue, the value of the collateral is equitable with the net recovery realizable from its disposition as near as may be in the ordinary course of the business.
>
> Consistency in collateral valuation obviously does not mean that collateral will be assigned the same value throughout the proceedings as at their commencement, but merely that the most commercially reasonable disposition practicable in the circumstances should be the standard universally applicable in all cases and at every phase of each case.

<u>Id.</u> At 721-22. <u>See, e.g., Sutton v. Bank One, Texas, N.A. (In re Sutton)</u>, 904 F.2d 327, 329-30 (5th Cir. 1990) (going concern value); <u>Chrysler Credit Corp. v. Ruggiere (In re George Ruggiere Chrysler-Plymouth, Inc.)</u>, 727 F.2d 1017, 1020 (11th Cir. 1984) (value for purposes of adequate protection was determined to be the wholesale value because that was the "amount which the creditor would receive by its customary or commercially reasonable means of disposition"); <u>In re Beker Industries Corp.</u>, 58 B.R. 725, 737-38 ("the appropriate method of valuation . . . is going concern or fair market value"); <u>In re Phoenix Steel Corp.</u>, 39 B.R. 218, 224-25 (D. Del. 1984)

(value depends on the facts of the case, insuring "the secured creditor receives in value essentially what he bargained for"). To the extent that Quest contends that the value of its collateral should be based on a liquidation approach, that approach should be rejected.

### III. <u>CONCLUSION</u>

For the foregoing reasons, the Debtor respectfully request that the Motion be granted and that the Court order the authorization of the use of cash collateral without providing Quest any adequate protection and in the alternative, that the Court grant the Motion and deem the adequate protection offered by the debtor sufficient to allow the Debtor to use cash that may be Quest's cash collateral, and any other and further relief that this Court deems just and proper.

Respectfully submitted,

/s/ Anthony J. DeGirolamo
Anthony J. DeGirolamo (0059265)
3930 Fulton Dr., Ste. 100B
Canton, Ohio  44718
Telephone:  (330) 305-9700
Facsimile:  (330) 305-9713
E-mail:  tony@ajdlaw7-11.com

PROPOSED COUNSEL FOR THE DEBTOR
AND DEBTOR IN POSSESSION